Last case of the day. That's Travelers Casualty Insurance Company v. Insurance Company of North America. Numbers 06-4100 and 4101 along with 07-4690 and 08-1032. And Mr. Chabon, am I pronouncing that correctly? Well done if I can say so. I can screw it up. Don't worry. Chabon and Glaubinger? Yes, sir. Or Glaubinger? Yes, sir. Thank you, sir. May it please the Court, Joseph Chabon and Bud Larner who along with my partner Vincent Proto represent Travelers Insurance Company. I'd like to reserve, please, five minutes for rebuttal. That's fine. Your Honors, before I go into the argument, I wanted to point out that we have an issue in this case related to confidentiality of this Dow settlement. The settlements with Dow Corning and Dow Chemical are both in the record. And there was a confidentiality order that was entered in the case. And I'm going to try to stay away from the more sensitive aspects of the settlement. If we veer into that, let us know. I don't think I have anything that's going to get close. I don't think so either, Your Honor. We just didn't want to waive anything and we're obliged to try to protect the rights of Dow Corning and Dow Chemical because the dollars involved here are rather significant. Although the settlements took place more than eight years ago, I appreciate it. Let me ask you just an overarching question. There's a Phase I and a Phase II. The court found that the witnesses for Travelers were credible in Phase I, and therefore they acted not in bad faith. But in Phase II, the two decisions there made, the annualization and the how you, between indemnity and defense costs, they found, the court found that those decisions were not made in good faith. If that's the case, with the very same witnesses, why could they be found credible on one but not credible on the other? Doesn't one bleed over to the other? Your Honor, one does bleed over into the other, and in fact, part of my argument, I'm going to give you a relatively long answer to your question. The quick answer is yes. The longer answer is as follows. What Judge John did in this case was make a very searching review of the facts. He went well beyond what he needed to do, both in Phase I and Phase II, under Follow the Fortunes. But that's what he did in terms of hearing the evidence and making findings. And when he made those findings in Phase I, he found some things that are, we think, decisive for Phase I, which involves all the other allocation issues, and should be decisive in Phase II, which, of course, involves this issue that we call annualization. But, of course, your opponent's going to flip that. I think he may well, Your Honor, and I'd like to address it later. So if you found some, I don't believe you is what the court is saying in Phase II, and these are the same people that testified in Phase I. Why do you believe them in Phase I? Well, Your Honor, let's look at what the judge found in Phase I. First, he properly recognized, as he was supposed to in Phase II, that the burden of proof was on the reinsurer in this case to overcome the very deferential standard of Follow the Fortunes. That's Joint Appendix 61 of Paragraph 9. He also found specifically that the people involved here, including and particularly Mike Miley, who was the person he lambasted in Phase II, Miley, Stonehill, and Kingston did not consider any of the reinsurance implications. Now, that's a finding that he made in Phase I. He didn't change that finding, Your Honor, in Phase II. There was a different reason for what he did in Phase II, but he didn't turn around and say that in Phase II he thought that Miley was taking account of reinsurance implications, nothing of the sort. He also found that they never saw this thing called the Wigmore Memo, which INA, ACE tried to argue at the Phase I trial, was a roadmap for how to engineer an allocation that was going to hurt them. Well, the Plunkett and Cooney Memo seems to show that the Wigmore Memo was used in settlement negotiations, was it not? Yes, Your Honor, and the judge so found. And that was in effect internally a violation of the wall that has purportedly been set up to keep the claims people away from the reinsurance people. Your Honor, the wall breaks down. The testimony at the trial was that the wall breaks down at the top of the pyramid, and the top of the pyramid was Tim Yesman, who was doing the negotiations. He was also reporting to senior management in Hartford about what was going on. But the judge specifically found that nothing in that memo was designed or used or used by anybody to engineer something that was going to hurt ACE. The judge also found that Mr. Bencher, who did the reinsurance allocation at the end of the day to the particular contracts, also did not know what the reinsurance implications were. But I do come back to that finding with respect to Mr. Miley, who became in Phase 2 the victim of the judge's ire. And let me take a moment on what happened in Phase 2. The judge in Phase 2 found that travelers had a policy that they objected to annualization. And the evidence was crystal clear on that, and we at Travelers never made any bones about that. Yes, when Travelers gets in in one of these coverage lawsuits, they argue against annualization to the extent it comes up and in the context of the settlement negotiations. Why? Because if you have a three-year policy and it carries a $4.5 million limit, it's either $4.5 million times three, or it's $4.5 million times one. Now that answer, taken in a vacuum, answers itself. The other thing that gets me. So what you're saying is you're committed to follow that in Phase 2 by virtue of the agreement that you had with Dow? No, Your Honor, we didn't say that. What we said in Phase 2. Well, I thought you said that you were opposed to annualization. I don't understand the question. I thought you just said, maybe I misheard you, that initially you were opposed to annualization. Yes. In the back-and-forth, in the give-and-take negotiation between Mr. Yesman and the people at Dow Chemical, Mr. Yesman was opposed to annualization. But what his testimony says, and this is at page T1820 to 1825 in the record, what Yesman says is that he is a negotiator, and he's done this many times, and he's negotiated deals for hundreds of millions of dollars in one policyholder. Yesman says that he has typically a hierarchy of negotiation points. And in this particular case, his hierarchy was the centerpiece of his negotiation was the number of occurrences. And I can explain that readily. If the number of occurrences is one, then they only get one occurrence limit for each one of the policies. If the number of occurrences is unlimited so that there's one occurrence for each one of the claimants, the available coverage goes into the many hundreds of millions of dollars. It has a huge impact. So Yesman testified at phase two, consistent with his phase one testimony. His number one objective was to win the negotiation on number of occurrences. He had another problem. There was also this issue of how to characterize these breast implant claims. Do you characterize them as products claims, which he was arguing for, or do you characterize them as non-products? The significance, Your Honors, is two. One is that the products cover was substantially depleted already by a contract that Dow Corning had, and that contract of settlement was resolved on an annualized basis. So there was a limited amount of products cover that he could pay them even if he wanted to. But he didn't want to move off his products position, he testified, because there's another element of the non-products. If it was non-products. Let me just call just a timeout briefly, make sure I understand. Obviously, you're appealing, you're cross-appealing on phase two. I am, Your Honor. But so some of the questions we're going to ask you are on phase one because we're going to put them all together. Yes. At some point, I'm going to want to ask you a number of questions with respect to phase one. But my first question was if, obviously, if they found, for example, Miley not credible with respect to phase two, why should Miley be found credible with respect to phase one? Because the reason he found Mr. Miley not credible with respect to phase two does not negate all of the findings, and I won't go through them again, about how Miley didn't do anything to enhance or maximize travelers' reinsurance recoveries. He made no inconsistent finding in phase two. What he faulted Miley for, in essence, and this is in the record at JA 87, he says, one, Miley failed to identify the specific Michigan law upon which he was relying with respect to the annualization point. Now, Miley's testimony in the case was, I researched it. I remember I researched it. He's a lawyer. All these travelers' people are lawyers who are involved in this. I researched it. This is what we specialize in. I'm familiar with the body of law at Kennedy. My guess is the court just was not buying it because there was no Michigan law on point to point you one way or the other, and the only thing that later Miley was appointing to, I think, was New Jersey law, which had zip relevance to this whole case. Yes, Your Honor. But the point of no Michigan law cuts very much in our favor, not in their favor. Let's not forget that this same judge denied cross motions for summary judgment on the annualization issue, and let's tie that in to the question of how follow the settlements is supposed to work. Follow the settlements according to all the cases out there, and this would include Gerling v. Travelers, North River v. Ace, the Uniguard case, the Signoree case in the Third Circuit. All those cases say that the follow the settlement standard is deferential and it is intentionally low. But, again, isn't bad faith, for lack of a better word, a holistic determination? You're saying that the court is sort of picking and choosing. I don't find Miley credible on this, but I do find him credible on that. Well, Your Honor, he made specific findings in phase two as to why he didn't find Miley credible. The other thing that troubled him about Mr. Miley's testimony, and he cited it with respect to all the Travelers' testimony, is that the Travelers' witnesses were candid and very honest about saying our preferred position is to argue against annualization when we're dealing with the policyholder. It brings me back to Yesman. I didn't get the full thought out, Your Honor. What Yesman testified to is that he wasn't even going to deal with annualization because, as a negotiation point, it was a tertiary point. His main points were number of occurrences and the non-products, which would mean that his insurance policies, if it were non-products, didn't have an aggregate limit. That's where his main concern was. His main concern was not with annualization. So the judge sits there and listens to our own witnesses say, we agree that annualization is not a good thing. But our witnesses also said, we've come across it many times. Yesman said, I've negotiated this point many times, and I concede it when I have to. And what he said here was that he knew he'd never give up on number of occurrences. It was one occurrence. He said non-products was an important point, but he knew he'd have to give it up because in order to deal with more than a billion dollars of liability, he was going to have to pay more than the products money he had in his pocket. The other thing he said was that he didn't want to address annualization until he got number of occurrences nailed down. Why? Because he didn't want to address number, the annualization issue, and then have them argue this is multiple occurrences. So now you have even more coverage. He wanted to address his number one priority first. And I would say to you, Ron, the essence of follow the settlements, the essence of it is not only do they have to follow our reasonable settlements, they have to follow our reasonable allocations, and they have to follow our reasonable negotiation tactics. But what the court is saying on phase two, it wasn't a reasonable allocation. He didn't buy into the annualization. He didn't buy into it in a state where there was no law on the issue. When he denied the summary judgment motion, he said the issue is arguable both ways to the point where I cannot decide it. And I would make an analogy, Your Honor, between that situation and what follow the fortune says. Follow the fortune says if it's arguable, we win. Was the underlying insurance policy ambiguous with respect to whether pre-occurrence limits could be annualized? Yes, Your Honor, because it – The judge found that it wasn't, right? I'm sorry? I thought the judge found that it was not ambiguous. The judge – what the judge did – He found on the summary judgment motions – let's back up a little bit if we may. He found on the summary judgment motions that there was ambiguity, and he couldn't decide as a matter of law which way this issue should turn. But what he didn't take account of on the summary judgment motions is the import, the very substantial import of follow the settlements, because that is more than just a tiebreaker. That's something that says if the position is arguable, then the seating company, the reinsured, which is us, should win. He didn't take that into account at all. And I draw the court's attention to the Travelers v. Girling case. There's a very particular portion of the case, and this is at page 188, Travelers v. Girling. The issue in the case was did travelers treat asbestos losses all as one occurrence? The reinsurer in that case argued there is nothing to support it. This is nonsense. The court in that case says we are not going to decide whether travelers should have or could have treated these asbestos losses as one occurrence or multiple occurrences. And the court says, indeed, were we to undertake such an analysis, we would be engaging in precisely the kind of intrusive factual inquiry that the follow the fortunes doctrine is meant to avoid. That's what he did. You talked about phase two. When you come back on rebuttal, we're going to deal with phase one. We'll deal with Mr. Glavine. I'm very happy to deal with phase one. Just to put a cap on this part of the discussion, Your Honor, these follow the fortunes cases say, and Cigna v. North River in the Third Circuit is one of them, these cases say that you can't use the insurance company's positions asserted or not asserted against the policyholder on the back end. But there's an underlying principle. You've got to believe the witnesses, and the court didn't do that. Your Honor, the reason he didn't believe these witnesses had to do with that corporate policy. It had to do with that corporate policy, and he faulted Mr. Miley against exactly that background. He also said that there was – He was pretty careful in how he did it there. We'll get you back on rebuttal on phase one. All right. Let me touch on, if I may – We'll get you back on phase one. You have plenty of time, then. You've gone over, and we'll give you more time than you even asked for when you get back on rebuttal. Do you want me to close now, Your Honor? I'm looking here for Mr. Glaubinger, and then you can close later on. I was going to touch briefly on this Yohannan point. We'll get you back. All right. Thank you, Your Honor. We'll talk about Yohannan and Eve and everything else. Okay. Thank you. May it please the Court, my name is Wayne Glaubinger from Mound, Cotton, Mullen, and Greengrass, representing the insurance company of North America, Pelley & Cross Appellant. Judge Amber, I'd like to start where you began, a discussion of the Plunkett & Cooney document found in the Joint Appendix 749. The first time we saw that document was in the Joint Appendix. It wasn't given to the judge until after phase one. With all of that, let's assume that there was a breach, that the wall that existed between claims and reinsurance was breached. But how bad is the Wigmore Memo, what's referred to in the Plunkett & Cooney table of contents? The Wigmore Memo, Your Honor. Obviously, I'm not as tied to it as you are, but it doesn't look all that bad. I think there's two responses to that. First of all, Your Honor, the Wigmore Memo, when it's been contained in the Plunkett & Cooney and Settlement Binder, and Mr. Yesman received it, first of all, raises credibility concerns to Mr. Yesman in phase one. It was found not to be credible in phase two. Because all of those points, Mr. Yesman said he never saw it, he never saw the Wigmore, it had nothing to do with the indemnity agreement, it didn't have to do with settlement. I'm saying concede all that. The second point. How bad is the Wigmore Memo? I saw no smoking gun in there. It provides a roadmap concerning defense costs, products, non-products, and with respect to occurrence. And the judge found that the non-product, one occurrence, and indemnity only were resolved as of the 7-7-98 meeting at JA-43. That was Mr. Yesman, who would have been the person who resolved that. He resolved all of those things. Why don't you pull the memo out, which I think you have in front of you, and just tell me where it is that you think there's something in there that's so significant that this breach was something that has to be rectified? If it's solely defense costs, you'll never get out of the primary, and there will be no reinsurance. What page are you on here? I don't have it in front of me, Your Honor. Do you want to get it? We'll pull it out, yes. But I know one portion of it is if it's defense costs only, not indemnity, the dollars all stay in the primary layer, the 70AL policies, and there's no reinsurance, and it would stay there forever because it would continually be defense costs paid, and my client's policies would never be hit. But he's just stating facts, right? Facts that relate to reinsurance and how to characterize the claims for reinsurance purposes. He's a reinsurance manager who is not supposed to be reporting to the claims person who is settling the case. Everyone agrees that is off-limits and inappropriate. Why don't we just see if we can get it in front of you. Yes, Your Honor. And just so you understand where I'm heading, if travelers did use it in the settlement negotiations, what aid would it actually have gotten from that memo? It would allow them to settle the case in a manner and put it in the settlement agreement in a manner to maximize its reinsurance recovery because it would not have reinsurance on the AL primary policies if the settlement was all defense costs or a portion of defense costs. It would not potentially have any reinsurance with respect to my client's policies if it was a multiple occurrence basis and stayed within the primaries, which Mr. Wigmore points out. It would not, as he also points out, defense costs. So on every avenue that Mr. Wigmore points out, it's to get it out of the primaries and into the excess because of reinsurance. So you have the Wigmore memo now. Now, where is there something in there that truly would have given a significant advantage? He talks about in multiple places, Your Honor, that on defense costs, he talks about two things, the reinsurance implications for products versus non-products. You're on page 39. This is on page 39, correct. It's introduction on reinsurance under 3A. I see you also have transcripts. Is it 907? 902, Your Honor. 902. 3902, 9074 is the transcript. 902, okay. Right. He talks about reinsurance scenarios as to, one, whether it's products, non-products, and single or multiple occurrences. He then describes if it's – So what specific allocation decision can be traced to that? They settled it on a one-occurrence basis, non-products, all indemnity. He says on page 904, he talks about the reinsurance that exists on the primary layer, and he says that defense costs would not allow them to recover reinsurance because they're reinsured by Derinko, which is a captive. Right. So he gives the exact reinsurance implications for defense costs. He gives the exact reinsurance implications for occurrence, how many occurrences. If it's multiple, it doesn't get out of the primaries, which is undisputed. He also says – That's the negotiation on page 4, top page 4, which is 3904. He says, for example, thus Dow Chemical may argue a single occurrence in order to get through its primaries and into the excess layer. On a single occurrence basis, Your Honor, it would stay within the primaries. What happened in the settlement is that they didn't allocate it to all the primaries, which is a separate argument concerning maximizing reinsurance. I mean, they settled it on a one-occurrence basis, but didn't put any of the one-occurrence basis for breast implant claims in the post-'82 to-'87 policies, even though they were covered and triggered. Are these things that would not have occurred to the people negotiating the settlement if they didn't have this memo? They would not have known – I don't think Mr. Yesman would have known on a company coverage chart this big with these kind of implications, the reinsurance implications for settling it different ways. I don't think he would have known that in his head. Isn't he considering that – I mean, isn't that the very essence of what he's considering in negotiating? He should not be considering at all the reinsurance implications, and that was undisputed in this case. If it's a net deal, then you may not send it to Durinko for reinsurance recovery. But everyone agreed, both experts in Phase I, Mr. Yesman himself, Mr. Miley, I believe Mr. Kingston, that it would be inappropriate and would violate the duty of good faith under a reinsurance agreement to consider the reinsurance implications when you are, in fact, settling. And if you take the Wigmore memo and apply it to the Plunkett and Cooney, what we now know from Plunkett and Cooney, that it was in the settlement binder. We didn't know that at trial. We couldn't cross-examine Mr. Yesman when he said it had nothing to do with settlement. He put it in a drawer. It had to do with the agreement. We know all of that is not correct based on seeing this in a joint appendix. When you apply that, then you see that it actually was used as a roadmap, and everything in the Wigmore memo, the product, non-product, the defense costs, the number of occurrences were all used by Mr. Yesman in settlement, which we believe under file of the fortunes, both sides agree, would be inappropriate and wrong. The Wigmore memo, what we didn't know and what we know now, is Mr. Yesman did receive the Wigmore memo, and he received it as part of the settlement binder. And the judge obviously knew that in camera. We know that now. And I think we could have cross-examined Mr. Yesman, who was found not to be credible in Phase 2, as well as Mr. Miley by the judge. And we could have cross-examined him because everything he said concerning the Wigmore memo has turned out, based on the Plunkett and Cooney submission, to be false. So we would suggest the finding on Phase 2 of his credibility should really spill over to Phase 1, but I assume all we would get is a new trial on that issue. But that is our position. The Plunkett and Cooney document, we were told the Wigmore memo was a stand-alone document. There was nothing attached. It went in a drawer. I never used it. I never saw it. Someone from downtown asked about it. Now we know from the joint appendix that that's not true at all. In fact, that's untrue as to every single point Mr. Yesman testified with respect to that document. He was found not to be credible in Phase 2, and we didn't have the right to cross-examine him or ask him any questions at all about the Wigmore memo and the Plunkett and Cooney memo. What was the date of the Wigmore memo? The Wigmore memo is undated, but I believe Mr. Wigmore testified he prepared it in 1998, which would be consistent with the settlement. Was it prior to the July 8th sort of turnaround? Yes, Your Honor, prior to July 8th. And, of course, once again, Mr. Yesman's testimony that he thinks it might have been 1996 is, again, proven to be false now that we have the table of contents. But it was prior to the whole turnaround, the negotiations? Yes. Mr. Yesman would have had this document when he settled in July of 1998 concerning non-products, occurrences, indemnity only. So the rest of the folks, Mr. Miley and the rest, really don't matter on that point. With respect, Your Honor, to the other issue that pervaded Phase 1 was the sword-shield issue. The judge's findings, really, he hung his hat on three specific findings, the retention of counsel, Exhibit 105, which is the settlement binder, which we've talked about, and the experience of the SLG, the Special Liability Group, which Mr. Yesman was a member. These were all folks who were lawyers. Mr. Yesman was acting as a businessman. We were stopped at every turn in discovery and up to trial, and we filed an limine on sword-shield. We don't believe that the three bases the judge relied upon in connection with a business-like decision are correct because they fly in the face of sword-shield. The fact that they retained counsel, in our opinion, is meaningless because you can't draw an inference as to what counsel said or didn't say. Maybe they said it would be bad faith for Mr. Yesman to look at the memo that we know we now looked at. In connection with the experience of the SLG group, we don't know what experience they brought to bear on the issues in this case because we were not allowed to ask them. And with respect to 105, I think we've addressed that. We weren't allowed to see any of the opinions of Plunkett and Cooney or any of the opinions of outside counsel to test it. So for a separate reason, we believe phase one should be reversed as well. With respect to annualization, Your Honor, I'll just go back to the initial. Our motion was denied. Questions of fact were found concerning extrinsic evidence and the need to hear from witnesses concerning intent. We offered an overwhelming amount of evidence. The burden was on us, and we carried that burden. The underlying policy language, not only from the Aetna policy, from the underlying policy to that, from the subscription, were found by the judge to be clear and unambiguous, unrebutted expert testimony from George Spilios. Travelers' own witnesses, Mr. Miley and Mr. Yesman, testified essentially that our position was correct with respect to annualization. Travelers' own corporate position was exactly the position INA took in this case. Charles Stevens, the underwriter of the policy, said he saw nothing at all that was ambiguous about that policy. And no evidence was offered other than Mr. Miley, who was found not to be credible. The Michigan point I don't clearly understand because Mr. Miley testified, he didn't even look at Michigan law. He testified in the record. I don't understand the Michigan point either. But the point is you do follow the fortunes. That's what you do. And the way out is to show that something wasn't done in good faith. What constitutes bad faith? To the extent the courts have discussed it. Without reference to this case. I'm sorry. You're a court. What constitutes bad faith? The standard, I think, would be gross negligence or recklessness. What the courts have said. I would suggest if you have a maximization case, if you take steps solely to maximize your reinsurance recovery, that's summary judgment in the world of reinsurance. That is a bad faith. All experts agreed in this case, Mr. Hall, Ms. Barber, Mr. Yesman, you cannot do that. So if you take reinsurance implications into account and walk into that room and settle on that basis, I would say that is a bad faith case. Stop there. I believe we had more than that. The chemical products is a good example. Plantation suits, foreign suits, other litigations, hundreds of litigations all over the world. No analysis at all. Neither expert on traveler's side would even testify that it was reasonable. Mr. Oshinsky refused to do it. Mr. Hall refused to do it. Travelers could not explain the allocation. Ms. Stonehill was involved in the settlement. She had no idea the 15-5 split. Why wasn't any of the money? There's a reason she didn't. I think she was out of the picture when things turned around in July of 1998. She was involved. There were notes where she had 15-5, so she was involved in discussions about chemical products. She didn't do the actual settlement agreement. No one testified at all. There was no concrete explanation, I think are Judge Yon's words, as to the chemical products. I would submit to this Court there is no evidence at all in the record, and maybe counsel can point to me, that suggests why that was done at all. In fact, there are excess policies that sat below our policies that covered products in foreign jurisdictions like chemical products. Not a penny was allocated to any of those. Why? They had reinsurance. That's what the record says. Same argument, maximization of reinsurance. And what's your argument on the post-1982 policies not being allocated? Same argument, and I think the way to look at that, Your Honor, is they allocated to the pre-'82 policies. They didn't have reinsurance. They just gave up their right to collect reinsurance from the Dow captive. They obviously put those there because they understood those policies were triggered, and they covered it, just like the post-'82. On a one-occurrence basis, the way these were settled, the post-'82 policies work no differently than the pre-'82 policies. I think the pre-'82 would be $25 million. If you put it under the post-'82, it would be $22.75 million. Both Mr. Hall and Mr. Miley testified on a one-occurrence basis. There is absolutely no difference between the pre-'82 and the post-'82, except if you want to maximize your reinsurance, and this is my argument, not their testimony, to get up to the Ex-Im policies, which is precisely what was done. Thank you. I'd like to start with a – Actually, let's start with – let's go – phase one is where we're going to start on this one, and where we left off. Why was – if there's no difference between the post-1982 AL policies and the pre-1982 AL policies, why were they excluded in the mix? And I note that Hall did testify that, in fact, there's nothing materially different. He said he would have allocated – he would not have allocated either one, Your Honor. You see, it cuts the other way. It cuts the other way. What cuts the other way? The point that there was retrospective premium and there was captive reinsurance that was involved, and the fact that they did a net deal here, meant that he wouldn't have allocated to either one of them. He did agree that, in that respect, they were the same. And he thought the travelers actually went further than what it should have done. And on that point, Judge, I would point out to the members of the panel here that travelers had net for its own account $72 million of this very substantial settlement. But the point – thank you. You would bypass the excess policies, X and S policies, and get to the XN policies, and you would bypass the post-1982 AL policies if there's a reason to do so. There has to be a difference, something. And the only – what INA is saying, the reason you did it, is because that allowed you to get to the reinsurers. And your argument against that is? My argument against it is twofold, Your Honor. First of all, what was said is that we could have avoided allocating to the pre-1982 excess policies as well, and we didn't. And if you had not allocated to the pre-1982 AL policies – XS. Oh, XS, okay. XS, yes, Your Honor. But I'm talking about the AL policies for the moment. Why did you – what made you stop in 82 for policies that were not demonstrably different in any way? Your Honor, that's not clear on the record, but it is clear on the record that what we could have done was not allocated to either one of them, which would have driven more of the loss upward. And I would point out, Your Honor, that – go ahead. You've got to help me here. I will. What is the difference between the pre-1982 AL policies and the post-1982 AL policies? It has to do with the retrospective premium and the reinsurance that is available. But both have retrospective premiums, right? Yes. So why did you include some and not the other? We shouldn't have included any. That's the point. We shouldn't have included any. And there was also no – as my counsel points out to me, there was no cap on the retro post-1982. The point of that is, after 1982, we could keep billing back to Dow in an unlimited, perpetual way. Whereas in the pre-1982, there was a cap. And that made for the difference. But how does that affect whether there is to be claims against reinsurance? I mean, you can still include post-1982 and perhaps not go all the way up to – well, you don't have a cap. Your Honor, I think it points up the fact that there are a lot of ways to do these allocations. The fact that we had a net deal, and that was agreed on the face of the settlement agreement with Dow. The fact that we had a net deal meant that we couldn't bill it back to them. And basically, it was a wash. The court relied on the fact that this was a negotiation and I'm not going to get involved. But it looked like Dow, especially after July 8th of 1998, just sort of washed its hands and said, Look, they put it in writing. You allocate it the way you want. We'll allocate it the way we want. Get out of here. Your Honor, that's often done. And, in fact, that was done in the Traveler's Girling case. And that was a case where the court specifically said the parties didn't agree that it was multiple occurrences or one occurrence. And the court said, We don't even need to reach the question. We're not going to go there because we're not supposed to go there under the file of the settlements. Now, what Judge John did in some instances was go well beyond that, including on the annualization point. And I don't want to get sidetracked on that. Yeah, we're still on phase one. But if the settlement was so important and Dow didn't seem to care about the settlement, why should that settlement really be important to us? Your Honor, there's no evidence in the record Dow didn't care about the settlement. Dow is a huge company and they cared. It seemed as if, in the end, it said, just almost like he threw up his hands. You allocate it the way you want. We'll allocate it the way we want. Bye. Your Honor, that's not quite right. They put in the net provision in the settlement. They put in the fact that it was allocated as non-products. That was agreed. That was a huge point. They got to an all-cash endgame. After that, they were satisfied with the number and they didn't have a dog in the fight after that. Well, they didn't have a dog in the fight once they signed up the settlement agreement. But the settlement agreement does provide for various of the issues that were disposed of by Judge John in the phase one, things that counsel has just complained about. Who testified on behalf of Dow? No one. No one. No one at all, Your Honor. And we didn't call them and they didn't call them. The only evidence in the record about the negotiations was the evidence found credible by Judge John of the traveler's witnesses. That's the overriding point. If you'd address also, why did you skip over the excess policies? That has to do with the fact that there was no cap, Your Honor, and there was retro and there was captive reinsurance. That was the reason and that was what was testified to. Judge John found that credible. I mean, let's not forget that when this issue comes before the court on phase one, it comes to the court based on two elements of deferential analysis. One is the fact that the trial court made fact findings and we're all familiar with that. The other one is that it also comes with the deference that comes along with follow the settlements. And Judge John in phase one did recognize that deference. If he found any reasonable basis, even an arguable basis, as the Second Circuit has said in the Berling case and in the North River case versus Ace, that was enough. And don't forget, North River also says that even if we did something inconsistent with what was done in the pre-settlement analysis, that's okay as long as the allocation is reasonable. Their arguments on phase one don't take any account at all of all of that law very strongly in favor of deferential analysis that I would say is even more deferential than the analysis that this court must give Judge John's findings in the phase one hearing. What about defense costs? At the time of the settlement negotiations with Travelers, Dow had incurred massive defense costs with respect to the breast implant claims. Is that correct? That is correct, Your Honor. That is correct. And Judge John found At that point, they had nothing in indemnity losses at one point in time? No, they had indemnity and they had defense. Counsel wants to argue in their brief argues that How much indemnity did they have in at the time of the settlement negotiations? Yeah, I'm not clear on that, Your Honor. I thought it was, my recollection was nothing at the time. But the judge found that at that point in time, the thing that this insured was interested in was prospective indemnity, not the defense because they were looking to fireman's fund. He found that as a specific factual finding in the record. I thought that In our favor. I'm looking here at the Travelers conceded that had the money assigned to the breast implant claims not been allocated to, or been allocated to cover Dow's defense costs, Travelers would have been unlikely to get out of the AL policies and into the XN policies, and that's on the transcript of 188 and 189. Your Honor, that statement, is that a statement by counsel? I believe so. Yeah, that's a statement by counsel. That's a mathematical function, Your Honor. It's nothing more than a mathematical function. If it simply gets turned over in the primaries on defense, it never gets out. Judge Yon recognized that as well. We don't make any argument against that. What we're saying, however, is that there were substantial reasons why on the negotiations, in hearing in the back and forth between these parties that what Dow was interested in was the indemnity and not the defense, and Judge Yon made quite specific findings on that issue. He found that it wasn't in bad faith because, quote, Dow was interested in obtaining funds to pay prospective claims rather than recouping defense costs already paid, and because Dow was seeking defense costs from another carrier. But there's some reasons, as I look through this, to doubt that. It looks to me like the district court basis, well, first of all, Dow's description of the traveler's preliminary offer to pay out $15 million for past defense costs is within the ballpark, and on that one, that comment actually wasn't referring to anything prospective. It was referring to past defense costs, whereas Travelers was trying to avoid coverage for both, right? Absolutely, and Travelers was – and the fact of the matter is Travelers could not avoid coverage, Your Honor. Travelers could not avoid coverage. They knew they were going to pay. It was all a question of trying to get that number down as low as possible. That was what this negotiation was all about. And after July 7th, July 8th, was there any discussion between Travelers and Dow about the indemnity versus defense costs, or was it just all cash? It sounds like both sides were getting a little frustrated. Your Honor, the deal – Yesman testified to this quite clearly. He said they were both deploying their negotiation tools in the back and forth, but at some point he saw a chance to do a cash deal, and he jumped on it. So that's true. It became a cash deal, and at the end of these negotiations – and I think this squares with all of our common sense experience – at the end of the negotiations, it was about is it going to be X as a settlement number, or is it going to be Y? There are some other details that need to be worked out, true. But at the end of the day, it is a number. Now, one of the other things on that defense point, Your Honor, that was testified to, their expert and our expert said that in the give and take between primary carriers and that Travelers was a primary carrier in part, there will be times when the policyholder will choose a particular company. Their expert admitted to this, Linda Barber, and our expert testified to it. We'll pick a particular company and say we're going to go after them on defense. And they still had fireman's fund ahead of them to put the defense cost to. So they said, and it's undisputed on the record. Your Honor may say, you know, you doubt it, but there's no evidence going the other way in the record. Our people said it. There was nothing going the other way. I'm not saying anything, but I'm just saying that there's questions that exist. Why don't we talk about the rate of prejudgment interest? You did want to talk about it, Your Honor. Yes, I'd like to touch on that rate of prejudgment interest point. This is the so-called Yohannan point. And I would say on Yohannan and which choice of law should apply, we're talking about the difference between the New York rate of 9% and the Pennsylvania rate under Section 202 of 6%. And the prime principle of conflicts of law, I think we all know, and the Shirk is the only case, if I'm not butchering the name, out of this circuit says that a prime principle of choice of law is what did the parties agree to. Here the parties agreed that New York law would apply. They agreed that New York law would apply. And what Judge John did in this case was say he is going to extend Yohannan, which was a Section 238 case. And I know the Court is very familiar with 238 and Section 202. 238 is a court rule in Pennsylvania. He decided that he would extend that rule in a way that would override the party's choice of law. And I think that's what it comes down to in very simple terms, that what he should have done instead is recognize that Yohannan doesn't apply. The calculation of prejudgment interest, that's procedural, right? Well. If it's substantive, you've got a point. But if it's procedural, I don't know if you do. Your Honor, what Yohannan says is that 238 is substantive for eerie purposes, but procedural for choice of law purposes. And they had that somewhat peculiar opinion, and the reason it was peculiar was because the Third Circuit was dealing with the fact that the Pennsylvania Supreme Court had promulgated 238, and the only reason they had any constitutional authority to promulgate that statute was if it were deemed procedural. So the court said substantive for eerie, procedural for purposes of choice of law. But I would argue, Your Honor, that Section 202 doesn't carry with it the same purposes and the same background as 238. Now, 238 is geared quite specifically. That's the torts in 202's contracts. Well, it's not just that distinction. I know you wrote Francisco, Your Honor, and that Francisco says the distinction is without a difference for tax purposes. That's fine. We'll put that aside. Put that aside. But the fact of the matter is 238 on its face when one looks at the statute is geared very much towards pushing cases through the system and assigning fault as between a plaintiff and a tort defendant for who was responsible for the delay. 202, which is by the Pennsylvania legislature, simply says 6% applies to anything where the legal rate of interest is an issue, not simply, not applied uniquely to the court system. And that's why we make the argument that we can't argue with Yohannan as applied to 238. Yohannan seems to say that Pennsylvania is so interested in 238 that it would override the party's choice of law agreement. Pennsylvania is not so interested in Section 202 that it should override the party's agreement. I mean, in the most simple terms, that's what it boils down to, and the court should find a distinction between Yohannan in this case and instead should follow the Caffey rule. And Caffey's been cited in this circuit, including in the Scred Vet case, which is another one of these cases that decides the pre-judgment, post-judgment issue. Scred Vet was beyond complex. Yes, yes. It's another story, Your Honor. Anything else you want to? I wanted to touch. No, Don. We've given you now 31 minutes and your opponent 17, so I'll give you one more minute. One minute is fine, Judge. The accrual of post-judgment interest on pre-judgment interest issue. The Kaiser Supreme Court decision talks about what is a money judgment. It's a practical test. The question really is, is it a mechanical function or, as in Eves, the Third Circuit decision in Eves, is it something that actually has to be computed? Caffey says it's a mechanical test. That's a Sixth Circuit case. In this case, it's the same issue. The judge granted us the right to pre-judgment interest, but because of all the wrangling as to what the choice of law was going to be and what the accrual points were going to be, we didn't actually get credited with it and had this 16-month hiatus. I would say, Your Honor, that there's a real irony in that, because it should be a mechanical computation, which fits within the Section 1961 definition of what is a money judgment. I appreciate the judge's indulgence. Thank you very much. Thank you for this indulgence. Actually, we gave you $34.35, twice as much. And that's worth extra at lunch? No. Thank you, both counsel, for very well-presented arguments, very well-done briefs as well. I would like counsel to check with Ms. Zburski afterwards to have a transcript prepared of this oral argument and to share the costs. Thank you again.